| AO 91 (Rev. 11/11) Criminal Complaint | AUSA: Ranya Elzein<br>Special Agent: Daniel Bowling, ATF | Telephone: (313) 226-0213<br>Telephone: (901) 201-1342 |
|---|---|---|

# UNITED STATES DISTRICT COURT
for the
### Eastern District of Michigan

| United States of America<br>v.<br>Dennis PERRY | Case No. | Case: 2:22−mj−30132<br>Assigned To : Unassigned<br>Assign. Date : 3/15/2022<br>Description: RE: SEALED MATTER (EOB) |
|---|---|---|

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of  April 13, 2021 through October 25, 2021  in the county of  Wayne  in the  Eastern  District of  Michigan , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 841(a)(1)(a) and (b)(1)(A)(viii) and 18 U.S.C. § 2 | Distribution of controlled substances; aiding and abetting. |

This criminal complaint is based on these facts:
See attached affidavit.

☑ Continued on the attached sheet.

_Complainant's signature_

Daniel Bowling, Special Agent, ATF
_Printed name and title_

Sworn to before me and signed in my presence
and/or by reliable electronic means.

Date: March 15, 2022

_Judge's signature_

City and state: Detroit, MI

Hon. David R. Grand, United States Magistrate Judge
_Printed name and title_

# AFFIDAVIT IN SUPPORT OF AN APPLICATION
# FOR A CRIMINAL COMPLAINT

I, Daniel Bowling, a Special Agent ("SA") with the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF"), being duly sworn, hereby declare and state:

## I. PURPOSE OF AFFIDAVIT AND TRAINING AND EXPERIENCE

1. I am a Special Agent with ATF and am currently assigned to the Detroit Field Division, Detroit VII Group Office. I am an "investigative or law enforcement officer of the United States" within the meaning of 18 U.S.C § 2510(7); that is, an officer of the United States who is empowered by law to conduct investigations of and to make arrests for offenses enumerated in 21 U.S.C. § 801, et. seq. and 18 U. S.C. § 2516.

2. I submit this affidavit in support of a criminal complaint and arrest warrant for Dennis PERRY.

3. The facts set forth in this Affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses. This Affidavit is intended to show merely that there is sufficient probable cause for the issuance of the requested criminal complaint and arrest warrant. Thus, this Affidavit does not set forth all my knowledge of this investigation. Unless specifically indicated otherwise, all

1

conversations and statements described in this Affidavit are related in substance and in part only.

4. Based on the facts set forth in this Affidavit, there is probable cause to believe that between on or about April 13, 2021 and on or about October 25, 2021, in the Eastern District of Michigan, Dennis PERRY aided and abetted the distribution of over 50 grams of methamphetamine, its salts, isomers, and salts of its isomers, to an ATF Undercover Special Agent ("UC"), in violation of Title 21, United States Code, Sections 841(a)(1)(a) and (b)(1)(A)(viii), and Title 18, United States Code, Section 2.

5. I have been employed by the ATF since July 26, 2015. I completed SA Basic Training and Criminal Investigative Training at the Federal Law Enforcement Training Center. I was previously employed as a Police Officer with the Metropolitan Nashville Police Department in Nashville, Tennessee from March of 2008 through May of 2015. During my time there, I was assigned to the Gang Unit from August of 2012 until May of 2015. My duties included, but were not limited to, conducting controlled purchases of narcotics through utilization of confidential informants, obtaining and executing search warrants on persons, residences, and vehicles, debriefing confidential informants, interviewing witnesses, and proffering defendants. In addition, I analyzed toll records and led investigations that resulted in the interception of wired communications. I have

testified in both state and the federal court proceedings. Through my training and experience, I have become familiar with the characteristics of methamphetamine and how it looks in crystalized form, as well as the slang and coded language that drug trafficker use when discussing drugs and drug transactions.

## II. PROBABLE CAUSE

### April 2021 First Controlled Purchase

6. In April 2021, agents began investigating PERRY and his associates for distributing methamphetamine.

7. In the middle of April 2021, an ATF UC purchased approximately 324 grams of methamphetamine from one of PERRY's associates, Associate #1. Associate #1 is an individual whose identity I know. As explained below, PERRY drove Associate #1 to the location of the sale, and Associate #1 supplied the methamphetamine and conducted the sale.

8. Specifically, on the day of the sale, the UC and another agent arrived at a predetermined location in Detroit, Michigan to purchase methamphetamine. Shortly thereafter, the UC observed a blue Chevrolet Silverado with license plate number ECW9420 arrive at the location. A male exited the front passenger seat of the Silverado and approached the UC's vehicle. The male walked over to the UC, and the UC immediately identified the male as Associate #1 from a previously viewed driver's license photograph of Associate #1.

3

9. The parties walked to the back of the UC's vehicle, and Associate #1 placed a black plastic bag in the back of the UC's vehicle. The UC examined the bag and identified that the bag contained a clear plastic bag of a crystal-like substance consistent with methamphetamine. The UC asked Associate #1 if it was the "whole p," or whole pound. Associate #1 affirmed. The UC then handed Associate #1 $4,800. The parties then left the location in their respective vehicles.

10. Agents followed the Silverado to Anglin Street, where it stopped. The driver of the Silverado then exited the car and walked up to a 2020 Dodge Ram parked on the street in front of a house ("the Anglin Street residence"). The driver entered the Dodge Ram, where he remained for five to six minutes until another car arrived.

11. Agents ran the license plate of the Chevy Silverado and determined that it was registered to a woman. Agents reviewed publicly available social media for that woman and saw PERRY posing in photos together with the woman. Agents showed PERRY's photograph to ATF SA Mark Davis, who had surveilled the April 2021 sale, and SA Davis identified the driver of the Chevy Silverado as PERRY.

12. Chemical analysis of the substance purchased indicates it was approximately 324.9 grams of methamphetamine hydrochloride, with a 98% purity level.

## September 2021 Controlled Purchase

13. In September 2021, the UC purchased approximately 219 grams of methamphetamine from Associate #1. As explained in greater detail below, Associate #1 conducted the sale. Further, there is probable cause to believe that: (1) PERRY picked up the methamphetamine from the supplier and gave it to Associate #1 for the sale, (2) Associate #1 gave PERRY the proceeds of the sale, and (3) PERRY gave the proceeds of the sale to Associate #2, who supplied the methamphetamine. Associate #2 is another individual whose identity I know.

14. On the day of the sale in September 2021, agents were surveilling Associate #1's residence on Hull Street in Highland Park, Michigan. They saw PERRY arrive at the house next door to Associate #1's residence in the same blue Chevy Silverado that PERRY drove to the April 2021 sale. PERRY walked into this next-door house (the "Hull Street residence"). Law enforcement saw Associate #1 at the Hull Street residence at the same time. PERRY then left in the Silverado, and agents followed him. Soon after, agents saw Associate #1 leave the Hull Street residence in a red sedan.

15. Agents followed PERRY as he drove around and saw him meet with multiple vehicles. During this time, other agents saw Associate #1 return to the Hull Street residence in the red sedan.

16. While agents followed PERRY, they saw him parked on the side of the road without getting out of the vehicle, as if he was waiting for something or someone. PERRY then travelled to the Anglin Street residence, where agents saw him on the porch of the residence. Through investigation, agents have determined that Associate #2 lived at the Anglin Street residence between April 2021 and October 2021.

17. PERRY then left the Anglin Street residence and drove directly to the Hull Street residence and entered. A few minutes later, agents saw PERRY and Associate #1 leave the Hull Street residence. PERRY left in the Silverado, and Associate #1 left in the red sedan.

18. Law enforcement followed Associate #1 and saw him travel directly to a gas station in Detroit, Michigan, where he met with the UC and sold him suspected methamphetamine.

19. At the same time, agents continued to follow PERRY in the Silverado, who appeared to be driving aimlessly around without stopping. After the sale to the UC, agents followed Associate #1 as he travelled back to the Hull Street residence and entered the residence. Within a few minutes of Associate #1 entering the residence, PERRY arrived and entered the same residence.

20. PERRY left the residence a couple minutes later, and agents followed him as he drove the Silverado to the Anglin Street residence. PERRY parked in the driveway of the residence and entered.

21. Chemical analysis of the suspected methamphetamine that Associate #1 sold to the UC indicates it was approximately 219 grams of methamphetamine hydrochloride, with a 98% purity level.

22. I believe that on the day of this September 2021 sale, PERRY obtained the methamphetamine from Associate #2 from the Anglin Street residence and drove the drugs to the Hull Street residence, where he provided the drugs to Associate #1. I further believe that Associate #1 then took the drugs and sold them to the UC at the gas station. I believe that after the sale, Associate #1 returned to the Hull Street residence with the proceeds of the sale, gave at least a portion of those proceeds to PERRY, and PERRY then took that money to Associate #2 at the Anglin Street residence as payment for the methamphetamine that Associate #2 supplied.

### October 2021 Controlled Purchase

23. In October 2021, the UC purchased approximately 220 grams of methamphetamine from Associate #1. As explained in greater detail below, Associate #1 conducted the sale. Further, there is probable cause to believe that: (1) PERRY picked up the methamphetamine from Associate #2 and gave it to

7

Associate #1 for the sale, (2) Associate #1 gave PERRY the proceeds of the sale, and (3) PERRY gave at least a portion of the proceeds of the sale to the Associate #2.

24.     On the day of the sale, agents were surveilling a convenience store on Dearing St. in Hamtramck.  Investigation had previously revealed that Associate #2 worked at that convenience store in October 2021.

25.     Agents saw PERRY leave the store and drive away in a GMC Terrain.  The GMC Terrain was registered to the same owner and address as was the blue Chevy Silverado that agents saw PERRY driving in April 2021 and September 2021.

26.     Minutes later, agents saw PERRY return to the store and go inside.  A few minutes after that, agents saw Associate #2 exit the store and leave in the same 2020 Dodge Ram that agents saw PERRY enter after the April 2021 sale.

27.     Agents had previously placed a GPS tracker on that Dodge Ram.  The data from the tracker showed that the truck travelled directly to the Anglin Street residence and stopped in front of it.  Agents, who were surveilling the Anglin Street residence, saw the Dodge Ram parked in front of the residence with the lights on and still running.

28.     According to the GPS data, the Dodge Ram then drove directly back to the store on Dearing Street.  PERRY had remained at the store during this time.

PERRY and Associate #2 met at the store, and they left together in the GMC Terrain, with PERRY driving.

29.     Around the same time, agents saw Associate #1 leave his residence on Hull St, driving a silver Chrysler sedan.  Agents saw the sedan and the GMC Terrain that PERRY was driving travel into the same neighborhood, but agents lost sight of both vehicles.

30.     A few minutes later, agents saw Associate #1 travelling past his residence.  Agents followed him as he travelled to meet the UC.  Associate #1 met with the UC and sold the UC suspected methamphetamine.

31.      After the sale, agents followed Associate #1 as he travelled in the Chrysler to a gas station in Hamtramck.  Agents saw Associate #1 park his car at the gas pumps and enter the gas station before returning and putting the pump into the vehicle.  Agents then saw the GMC Terrain parked on the other side of the gas station, and they saw PERRY walk into the gas station from the opposite side of where Associate #1 was parked.  Agents saw Associate #1 walk into the gas station about the same time that they saw PERRY walking in.  A few minutes later, agents saw both of them walk back to their cars on opposite sides of the gas station.  They left the parking lot from separate exits.  Agents followed PERRY.

32.     PERRY travelled directly to the convenience store on Dearing Street and parked.  At about the same time, agents saw Associate #1 park the Chrysler,

9

and he and PERRY entered the store together. At this time, the Dodge Ram that agents saw travel to Anglin Street before the sale was parked in front of the store.

33. A few minutes later, agents saw PERRY and Associate #1 leave the store together and then leave in their separate vehicles.

34. I believe that on the day of this October 2021 sale, PERRY went to the convenience store where Associate #2 works to obtain the methamphetamine from Associate #2 for the sale. Associate #2 then went and obtained the methamphetamine from his Anglin Street residence and drove the drugs back to the convenience store. I believe that PERRY and Associate #2 then drove to meet Associate #1 and gave him the methamphetamine. I believe that Associate #1 then sold the methamphetamine to the UC. I believe that PERRY and Associate #1 then met and gave at least a portion of the proceeds to Associate #2 for providing the methamphetamine for the sale.

### III. CONCLUSION

35. Based on the foregoing facts and circumstances, I respectfully submit that there is probable cause to believe that between on or about April 13, 2021 and on or about October 25, 2021, within the Eastern District of Michigan, Dennis PERRY aided and abetted in the distribution of over 50 grams of methamphetamine, its salts, isomers, and salts of its isomers, to an ATF Undercover Special Agent ("UC"), in violation of Title 21, United States Code,

Sections 841(a)(1)(a) and (b)(1)(A)(viii), and Title 18, United States Code, Section 2.

Respectfully submitted,

_____
Special Agent Daniel Bowling
ATF

Sworn to before me and signed in my
presence and/or by reliable electronic means.

_____
Hon. David R. Grand
United States Magistrate Judge

Dated: March 15, 2022

11